RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0005p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RANDY PATRICK ALMAN; MICHAEL BARNES;
TRIANGLE FOUNDATION,

*Plaintiffs-Appellants*,

*v.*

No. 10-2489

KEVIN REED, Officer, Wayne County
Sheriff's Department; RANDY THIVIERGE,
Officer, Westland Police Department;
ROBERT SWOPE, Sergeant, Westland Police
Department; COUNTY OF WAYNE, MICHIGAN;
CITY OF WESTLAND, MICHIGAN,

*Defendants-Appellees*,

JOHN BUFFA, Officer, Wayne County
Sheriff's Department,

*Defendant*.

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 08-14168—Gerald E. Rosen, Chief District Judge.

Argued: March 6, 2012

Decided and Filed: January 7, 2013

Before: KEITH, BOGGS, and MOORE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Mary K. Kator, RAINBOW LAW CENTER, PLLC, Southfield, Michigan, for Appellants. Margaret M. Flanagan, WAYNE COUNTY CORPORATION COUNSEL, Detroit, Michigan, for Appellees Wayne County and Deputy Reed. Gregory A. Roberts, CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellees Thivierge, Swope, and City of Westland. **ON BRIEF:** Mary K. Kator, RAINBOW LAW CENTER, PLLC, Southfield, Michigan, for Appellants. Margaret M. Flanagan, WAYNE COUNTY CORPORATION COUNSEL, Detroit, Michigan, for Appellees Wayne County and Deputy Reed. Gregory A. Roberts, Gail P. Massad,

1

CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellees Thivierge, Swope, and City of Westland.

KEITH, J., delivered the opinion of the court, in which MOORE, J., joined, and BOGGS, J., joined in part and in the judgment. BOGGS, J. (pp. 25–26), delivered a separate opinion concurring in part and dissenting in part.

————————

**OPINION**

————————

KEITH, Circuit Judge. Plaintiffs-Appellants Randy Alman ("Alman"), Michael Barnes ("Barnes"), and the Triangle Foundation sued several Michigan law enforcement officials, the City of Westland, and Wayne County for their respective involvement in Alman's arrest and the seizure of Barnes's vehicle during an undercover operation. The district court granted the Defendants' motion for summary judgment after finding that probable cause existed for the various state and municipal offenses that Alman was charged with violating. The Plaintiffs appealed. For the reasons discussed below, we REVERSE the district court's judgment in part, AFFIRM its judgment in part, and REMAND the case for further proceedings consistent with this opinion.

## I.  FACTUAL BACKGROUND

Plaintiffs-Appellants Alman and Barnes are gay men and domestic partners who lived in Yorktown, Indiana in October 2007. Alman was arrested in Westland, Michigan on October 12, 2007, during an undercover police operation in Hix Park, while he was taking a break from helping his mother move to a nearby apartment building. This case arises out of the circumstances of his arrest and the subsequent seizure of the car Alman had driven to the park, which belonged to Barnes.

### A.  **Alman's Arrest**

Around 1:00 p.m. on October 12, 2007, Alman decided to take a break from helping his mother move to a new apartment and go visit Hix Park, which was nearby. Hix Park is a public nature park with maintained trails winding through the woods, and its entrance drive leads to a parking lot with a pavilion nearby. When Alman arrived at

the park that day, he parked his car and remained in his car for a while listening to the radio. He eventually got out and sat down at a picnic table under the pavilion. Defendant-Appellee Kevin Reed, a Wayne County Deputy Sheriff who was working undercover, approached Alman at some point after Alman sat down at the table and struck up a conversation.

Deputy Reed was part of a law enforcement task force staffed by officers from the Westland Police Department and the Wayne County Sheriff's Department. Sergeant Robert Swope of the Westland Police Department supervised the team, which, along with Deputy Reed, also included Officers Randy Thivierge and John Buffa of the Westland Police Department. The task force, known as the Metro Street Enforcement Team ("MSET"), was formed to conduct surveillance at Hix Park to investigate complaints of lewd conduct and possible sexual activity taking place in the park. (Sgt. Swope testified that his supervisor informed him that Department of Public Service workers had found empty condom wrappers and pornographic materials while emptying trash cans in the park.)

At the request of Swope's supervisor, Lieutenant Engstrom of the Westland Police Department, MSET had conducted visual surveillance at Hix Park prior to October 12, 2007, and although they had found used condoms along the trails in the park, they had not observed any sexual or lewd activity during those outings. (R.40-5 at 7.) Lt. Engstrom instructed Sgt. Swope to continue the surveillance and conduct a decoy operation in the park with his team. That operation took place on October 12, 2007.

Sgt. Swope supervised the decoy operation, Deputy Reed acted as the decoy, and Officers Thivierge and Buffa were the surveillance and backup officers. Swope monitored the operation from his car, while Thivierge and Buffa surveilled on foot and in plain clothes. Swope testified that he selected Reed to be the decoy because Reed had experience working with the morality unit for the Sheriff's Department for about five years.

When the officers arrived at the park, they observed Alman sitting on the picnic bench under the pavilion. According to his testimony, Reed walked over to the pavilion, sat down at a picnic bench, and struck up a conversation with Alman because Alman was the only person around. (R.42-3 at 20; R.40-5 at 10.) Alman testified that Reed asked him what he was doing in the park, and Alman told him that he was taking a break from helping his mother move. Alman also told Reed that he and his partner had just moved to Indiana after living in California for some time. (R.42-3 at 20.) Reed testified that Alman's mentioning his "partner" led him to assume that Alman was gay. (R.40-5 at 10.)

There is some dispute about what else was discussed and what happened next. Reed testified that Alman told him he liked to visit Hix Park for recreation, but Alman testified that he had never visited Hix Park before that day. (R.40-5 at 11; R.42-3 at 7-8.) According to Reed, Alman asked him if he had found the park through a website called "squirt.org," which Reed had never heard of before that day. (R.40-5 at 11.) Reed told Alman that he was in the park to look for deer, and testified that Alman said he had often seen deer in his mother's yard nearby. According to Reed, Alman then invited Reed to "take a walk down the trail" to see if they could find "a big buck." (R.40-5 at 12.) Alman disputes this, claiming that he got up and said he was going for a walk and leaving the park, and that Reed then got up and followed him without invitation. (R.42-3 at 20.) In any event, it is undisputed that Alman began walking down a trail and that Deputy Reed followed him. According to Alman, Reed asked him if there was a more secluded spot they could go after they had been walking a short distance. (R.42-3 at 20-21.) Reed testified, however, that Alman veered off on his own into a small clearing after they had walked a short distance. (R.40-5 at 12.)

Once in the clearing, the two men began talking. Alman testified that he believed that Reed was flirting with him, and that Reed told Alman that he "liked to watch" (R.42-3 at 23). Reed testified that he told Alman he was "a little nervous" and "new to this" type of activity. (R.40-5 at 13.) The two were standing close to one another when Alman leaned forward and reached out and touched the zipper area on the front of

Reed's crotch.  The fact that Alman touched Reed's crotch is undisputed.  What is disputed, however, is the nature of this touching.  Alman testified that he "brushed" his hand up against Reed's zipper area and that he did not even consider it touching (R.42-3 at 22); Reed testified that Alman "grabbed" his crotch with his "whole cupped hand" for "an instant, maybe a second or half a second."  (R.40-5 at 14.)  Not expecting it, Reed took a step back, and Alman went down on one knee.  Alman testified that he was positioned "sideways" to Reed when he went down on one knee, and that he pretended to tie his shoe to demonstrate that "everything was okay."  (R.42-3 at 22, 23; R.42-15 at 58.)  For his part, Reed did not mention whether Alman was facing him or facing sideways, and he did not recall whether Alman pretended to tie his shoe, stating that Alman's hands may have been "by his side or maybe even resting on his knee."  (R.40-5 at 17.)  At that point, Reed pulled out his badge and told Alman that he was under arrest. (R.40-5 at 18.)

Reed walked Alman back to the pavilion, where the other officers were waiting. They handcuffed him and placed him in a squad car when one arrived.  Reed reported what had happened to Sgt. Swope, telling Swope that he arrested Alman after Alman had "grabbed me or touched my crotch."  (R.40-5 at 20.)  Swope testified that he did not ask Reed if Alman had used force, whether Alman propositioned him, or whether Reed had said or done anything that might have caused Alman to believe that he had consent to touch Reed.  (R.42-5 at 2.)  On Swope's orders, the car that Alman drove to the park was towed away and impounded by the Westland Police Department.  (R.40-5 at 22.)

Alman was booked, and based on Swope's instructions, Officer Thivierge wrote Alman an Appearance Ticket, charging him with Accosting and Soliciting and Fourth Degree Criminal Sexual Conduct ("CSC4"), which are Michigan state criminal offenses. Alman was held in a cell at the Westland Police Department for about two hours and was released after he posted a $150 bond.

**B.  Seizure of Barnes's Vehicle**

On the day of his arrest, Alman drove to Hix Park in a car that belonged to his partner, Michael Barnes.  After the vehicle was towed and Alman was released from the Westland Police Department, Alman was given several forms: a "Notice of Impoundment of Vehicle Nuisance Abatement" form; a "Vehicle Seizure Push-Off/Nuisance Abatement/Drag Racing, Notice of Seizure and Intent to Forfeit" form; and a "Street Enforcement Team Notice of Impoundment of Vehicle Nuisance Abatement" form.  A few days after Alman's arrest, Barnes traveled to Michigan to retrieve Alman and his car.  On October 17, 2007, after learning of his options, Barnes elected to redeem his vehicle without contesting the seizure by paying the $900 redemption fee, as described on the forms.  Barnes signed an acknowledgment of the vehicle's release and his payment.  That acknowledgment form stated, *inter alia*: "This precludes any action in this case regarding the vehicle and constitutes a final settlement of the civil nuisance abatement case.  This settlement is independent and has no effect on any criminal charges that may arise from the same incident."

With the release letter in hand, Barnes went to retrieve his car from the Westland Police Department at around 2:00 p.m. on October 17.  When he arrived, he was told that the only person authorized to release the car was Sgt. Jedrusik, who was not at the station at the time.  (Barnes had been given a phone number and was instructed to call before retrieving his car, but he did not call before going to the police station.)  The desk officer told Barnes that Officer Thivierge could release the vehicle, but that he would not return to the station until 6:00 p.m.  Barnes then went to the mayor's office to complain.  After failing to meet with the mayor, Barnes contacted The Triangle Foundation, a LGBT advocacy organization that has since been renamed Equality Michigan.  Barnes traveled back to the police station with a Triangle Foundation representative at around 6:00 p.m., and Barnes was able to retrieve his car after Swope, who was in the station at the time, contacted Sgt. Jedrusik.

## C.  Dismissal of Charges Against Alman

Alman initially was given an appearance ticket charging him with violating Mich. Comp. Laws § 750.448, Soliciting and Accosting; and M.C.L. § 750.520e, Criminal Sexual Conduct in the Fourth Degree (CSC4).  Luke Skywalker, the assistant county prosecutor assigned to the case, testified that he adjourned the case until his office could check with Prosecutor Kym Worthy about whether to proceed with the case in light of the County Prosecutor's policy on prosecutions for sexual activity in public places.  (R.42-12 at 2.)  That policy reads, in relevant part:

> The Prosecutor's Office receives a large number of warrant requests and vehicle seizure requests in cases involving allegations of sexual conduct in public places.  This policy statement is intended to provide local police agencies, criminal defense attorneys, and the public in general with the standards used by the Prosecutor in reviewing those requests.
>
> . . .
>
> An unsolicited sexual act or exposure to a member of the public or an undercover police officer will bring a misdemeanor charge of indecent exposure pursuant to MCL 750.335a or disorderly person-obscene conduct pursuant to MCL 750.167(f).  Charges will not be pursued by this office if the officer's conduct was designed to make the individual believe the act was invited or consensual.

(R.50-11 at 2-3.)  The policy statement also includes this disclaimer: "This policy does not govern the enforcement of municipal ordinances.  That responsibility rests with the local police agencies and municipal attorneys.  Nothing in this policy is intended to alter the practices of local police agencies in enforcing violations under their respective local ordinances."  (*Id.* at 3.)

Skywalker testified that someone in the Wayne County Prosecutor's Office told him to dismiss the ticket against Alman.  (R.42-12 at 3.)  The state charges, accordingly, were dismissed on the prosecutor's motion during a hearing on December 20, 2007.  On the same day, after consulting Westland's City Attorney, Officer Thivierge issued Alman an appearance ticket for having violated two Westland municipal ordinances during his encounter with Reed: § 62-97, being a disorderly person; and § 62-67, battery.  Alman

moved to dismiss these charges, and at a hearing on May 20, 2008, a state court judge dismissed the disorderly conduct charge. The judge stated that disorderly conduct required some "exposure of bodily parts." The judge then held an evidentiary hearing regarding the battery charge and ultimately denied Alman's motion to dismiss, clearing the way for trial on that charge. On the day of the trial, however, none of the officers appeared in court, so Judge Bokos dismissed the battery charge. The City Attorney did not bring the charge again.

**D.  The Instant Litigation**

Plaintiffs initiated this action against the officers, the City, and the County on September 27, 2008, seeking relief under 42 U.S.C. § 1983 for alleged violations of their constitutional rights. Their Amended Complaint listed twelve counts: eight on behalf of Alman; three on behalf of Barnes; and one on behalf of Alman, Barnes, and The Triangle Foundation, collectively. Alman raised claims based on the Fourth Amendment (Counts I-V), the Fourteenth Amendment (Counts VI and VII), and Michigan state malicious prosecution law (Count VIII). Based on the impoundment of his vehicle, Barnes raised Fourth Amendment claims (Counts IX and X) and a state law abuse of process claim (Count XI). Finally, Plaintiffs together raised a First Amendment claim, claiming that the Defendants' conduct would chill other members of The Triangle Foundation from engaging in protected activity (Count XII). Following discovery, Defendants filed motions for summary judgment, which the district court granted on October 7, 2010, dismissing all of the counts raised by Plaintiffs. In their timely appeal Plaintiffs only address the district court's dismissal of the counts related to Alman's arrest and the seizure of Barnes's car.

## II.  STANDARD OF REVIEW

We review a district court's grant of a motion for summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of the non-moving party. *Ireland v. Tunis*, 113 F.3d 1435, 1440 (6th Cir. 1997). Summary judgment is proper if, after viewing the evidence that way, there are no genuine issues

of material fact, and the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(a). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When faced with a properly-supported motion for summary judgment, the non-movant must provide "significant probative evidence" to defeat the motion. *Id.* In reviewing the record at the summary-judgment stage, we must not make credibility determinations, weigh the respective value of evidence, or resolve material factual disputes. In analyzing the evidence offered, we of course must draw all reasonable inferences in favor of the non-moving party, but that does not mean that we must credit and accept the non-movant's characterization of an otherwise disputed factual occurrence that affects a legal determination. When faced with such a dispute regarding a material fact, we must send the case to a jury.

### III. DISCUSSION

This appeal raises several issues for our review. The district court granted summary judgment for Defendants-Appellees after finding that probable cause existed for the offenses that Alman was charged with violating. Accordingly, we first examine whether probable cause existed for each of those offenses. Second, we address whether Sgt. Swope is entitled to qualified immunity on the claims against him. Third, we address whether Alman's claim of malicious prosecution was properly dismissed. Fourth, we address whether the claims based on municipal liability under § 1983 were properly dismissed. Fifth, we address Barnes's claim that the seizure of his vehicle violated the Fourth Amendment. And finally, we address whether Barnes's claim for abuse of process was properly dismissed.

## A.  Existence of Probable Cause

Alman was arrested and eventually charged with four different offenses: two Michigan state offenses, (1) criminal sexual conduct in the fourth degree, M.C.L. § 750.520e, and (2) solicitation or accosting, M.C.L. § 750.448; and two City of Westland municipal offenses, (3) being a disorderly person, Westland Mun. Ord. § 66-97, and (4) battery, Westland Mun. Ord. § 62-67.  Those charges eventually were all dismissed, and Alman claims that his Fourth Amendment rights were violated because his initial arrest was not supported by probable cause, yielding civil liability under § 1983.  The Fourth Amendment prohibits unreasonable searches and seizures, including arrests, but "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  The Supreme Court has explained that "'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  Whether Alman's constitutional rights were violated (and by extension, the viability of his § 1983 claims) therefore hinges principally on whether there was probable cause to arrest Alman in the first place.

"When no material dispute of fact exists, probable cause determinations are legal determinations that should be made" by the court. *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005). But "[i]f disputed factual issues underlying probable cause exist, those issues must be submitted to a jury for the jury to determine the appropriate facts." *Id.* "Given then, that probable cause is a legal question, but that underlying factual disputes related to probable cause must be submitted to a jury, our inquiry on review must be whether sufficient facts are in dispute with respect to probable cause to require fact-finding by a jury here." *Id.* at 729.

The district court held that probable cause existed for all of these offenses as a matter of law, rendering Alman's arrest and the seizure of Barnes's car lawful.  Having

found probable cause, the district court held that Counts I, II, III, IV, V, VIII, and IX all failed, and accordingly granted summary-judgment for Defendants-Appellees on those counts. We examine each charge separately to determine whether the undisputed facts establish probable cause.

### 1.        Criminal Sexual Conduct in the Fourth Degree

Relevant to this case, the Michigan offense of criminal sexual conduct in the fourth degree ("CSC4"), a misdemeanor, occurs when an individual "engage[s] in sexual contact with another person and if any of the following circumstances exist: . . . (b) Force or coercion is used to accomplish the sexual contact. Force or coercion includes, but is not limited to, any of the following circumstances: . . . (v) When the actor achieves the sexual contact through concealment or by the element of surprise." M.C.L. § 750.520e. For purposes of the statute, "sexual contact" includes "the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts." M.C.L. § 750.520a. Alman effectively concedes that his touching of Reed's crotch constitutes "sexual contact," (Appellants' Br. 34), so the only issue is whether Alman used "force or coercion" as defined in the statute to accomplish that contact. The district court held that the officers had probable cause for this offense because "Reed testified that Alman's actions surprised him and he backed away," making it reasonable to believe Alman achieved the sexual contact through concealment or the element of surprise. (R.57 at 27.) This was error.

Alman argues that, based on the available facts, no reasonable officer could have believed that Alman used force or coercion to touch Reed's crotch because the touching itself was not forceful and he did not achieve the contact by concealment or surprise. (Appellants' Br. at 34-38.) Defendants-Appellees argue that the act of touching Reed's crotch itself constituted "force" and that, in any event, Alman touched Reed by concealment or surprise because he touched Reed without warning and Reed testified that he was "surprised." (Reed Br. at 23; Westland Br. at 24-25.)

We first address whether the touching itself constituted force under the statute. Michigan law establishes that "force or coercion" in the criminal sexual conduct statute carries its ordinary meaning, and refers to touching achieved by power or compulsion, or accompanied by circumstances "sufficient to create a reasonable fear of dangerous consequences," and does not encompass any and all physical contact. *People v. Berlin*, 507 N.W.2d 816, 817-19 (Mich. Ct. App. 1993) (citations and quotations omitted). Drawing all inferences in Alman's favor, as we must, no reasonable officer in Reed's position could have believed that the brief touch here was achieved by force or coercion. The dispute between Alman and Reed regarding the nature of the touching (i.e., whether Alman "brushed" his hand against Reed's crotch or whether Alman "grabbed" Reed's crotch with his "whole cupped hand" for "an instant, maybe a second or half a second") is immaterial in this case. Under either characterization, there is no indication that Alman achieved the contact in question by power or compulsion, and there is nothing in the record describing circumstances that would be sufficient to create a reasonable fear of dangerous consequences. There is no evidence that Alman physically hurt Reed, blocked Reed's exit path or led him to a place with limited access, made threatening gestures, resisted when Reed backed away, or did or said anything else to impose his will. *Cf. id.* at 819 (no force or coercion when defendant "'took' [victim's] hand and 'placed it' on his crotch" and where victim "stated that he did not grab it or pull it and that he did not hurt her" and that defendant "did not resist at all when she pulled her hand away and that he did not threaten her"). Rather, it appears Alman reached out and touched Reed's crotch briefly while engaged in a flirtatious conversation with Reed, and that he dropped down to his knee and turned sideways as soon as Reed backed away. Under the circumstances, the contact here would not support a reasonable belief that the "force" prong was satisfied, even under Reed's characterization of the contact. Accordingly, there could be no probable cause that Alman committed CSC4 based on the touching itself being forceful.[1]

---

[1]We emphasize that this is a narrow holding. Future cases may present such attendant circumstances that would create a reasonable fear of dangerous consequences to support probable cause that CSC4 had been committed.

Regarding whether Alman achieved sexual contact by "concealment or by the element of surprise," Michigan cases suggest that, under CSC4, "concealment" and "surprise" do not refer to the subjective feeling of the victim, but rather the objective nature of the defendant's approach. In that vein, the statute typically prohibits someone from achieving sexual contact by sneaking up on someone while they are unaware, facing another direction, or sleeping. *See, e.g.*, *People v. Vaidya*, 2011 WL 14469 (Mich. Ct. App. Jan. 4, 2011) (CSC4 committed when defendant touched victim's genitals while she was lying face-down during a massage); *People v. Lowery*, 2010 WL 3604760 (Mich. Ct. App. Sep. 16, 2010) (CSC4 when defendant approached victim from behind and pressed his erection against victim's back and buttocks); *People v. Hubbell*, 2008 WL 867967 (Mich. Ct. App. Apr. 1, 2008) (CSC4 when defendant touched his penis to the mouth of the victim, who was sleeping at the time); *People v. Bazzy*, 2006 WL 3733272 (Mich. Ct. App. Dec. 19, 2006) (CSC4 where defendant grabbed the victim's buttocks and "waited to touch the victim until she had her back turned"). This does not mean that it is impossible for someone to commit CSC4 when they are facing the victim, and one can imagine any number of scenarios where, based on the context, CSC4 might be committed when a defendant makes sexual contact with someone *without* sneaking up on them or touching them while they are not looking.[2] It simply means that the typical case involves a victim caught by surprise based on the defendant's *surreptitious approach*.

In this case, it is clear that Alman did not sneak up on Reed or touch him while he was unaware or looking the other way; rather, Alman reached out and touched Reed when they were standing near each other and facing one another, engaged in a flirtatious conversation. Moreover, viewing the facts in the light most favorable to Alman, this was not a situation in which CSC4 may have been committed without a surreptitious approach. Alman did not "engag[e] in sexual contact with a victim in circumstances in

---

[2]As posited during oral argument, one such example might involve a patron at a restaurant reaching out and making sexual contact with a waitress when she asks to take the patron's order. *See also People v. Kurtz*, 2005 WL 2372038 (Mich. Ct. App. Sep. 27, 2005) (CSC4 when a defendant "took his middle finger and placed it up [his coworker's] rear end" and then "placed his finger near his nose and said, 'um sweet.'").

which it would be unexpected," *People v. Tran*, No. 236621, 2003 WL 21362988, at *3 (Mich. Ct. App. June 12, 2003), or in which someone "would not normally expect [sexual contact]," *In re Craven*, No. 260511, 2006 WL 1714019, at *2 (Mich. Ct. App. June 22, 2006).  The contact occurred in a secluded area in the midst of a flirtatious encounter rather than, for example, on a bus, in the workplace, or at a restaurant.  A reasonable person in the situation presented in this case could expect some sort of sexual contact to occur.  Without more probative facts, it cannot be said that there was probable cause to believe that Alman achieved sexual contact by concealment or surprise.  As the Michigan Supreme Court stated, "[i]f the [Michigan] Legislature had wanted to make all unconsented-to sexual contact punishable, with or without force, it should have said so."  *People v. Patterson*, 410 N.W.2d 733, 743 (Mich. 1987).  Given the statute's orientation and scope, no reasonable officer in Reed's position would have thought that Alman had committed or was about to commit CSC4 based on the record before us, and it was error to hold that probable cause existed as a matter of law.  Accordingly, we reverse the district court on that issue.

### 2.     Solicitation or Accosting

The Michigan offense of solicitation or accosting provides for criminal liability for: "A person 16 years of age or older who accosts, solicits, or invites another person in a public place . . . , by word, gesture, or any other means, to commit prostitution or to do any other lewd or immoral act."  M.C.L. § 750.448.  The district court held that the officers had probable cause as a matter of law because "an Officer in Deputy Reed's position could reasonably have interpreted Alman's actions as an invitation to do a 'lewd' act."  (R.57 at 28.)  This also was error.

Drawing all reasonable inferences in Alman's favor, the record indicates that Alman and Reed proceeded to a clearing in the woods and were engaged in a sexually flirtatious conversation when Alman reached out and touched Reed's crotch.  It also indicates that, after Reed backed up, Alman dropped to one knee facing sideways to Reed and either kept his hands at his side or pretended to tie his shoe.  There is some dispute about whether Reed asked Alman if they could go to a more secluded spot on the

trail or whether Alman veered off into the secluded clearing on his own, and about whether or not Alman pretended to tie his shoe. But these disputes are immaterial; without more probative facts to work from, no reasonable officer could have interpreted these actions (in either alternative) as an invitation to commit a lewd or immoral act in public. Alman correctly argues that "it could also be inferred from Alman's conduct that he was merely indicating sexual interest," and that a reasonable officer "would have needed more evidence of Alman's intentions before concluding that he was inviting Reed" to do a public lewd act. (Appellants' Br. at 40.) Aside from engaging in flirtatious conversation and his brief touching of Reed's crotch, there is nothing in the record that evinces such intentions on Alman's part. To the contrary, the only objective indications in the record about a state of mind relate to Reed, who stated that he was "new to this" and that he "liked to watch." Under these circumstances, there was no probable cause. To hold otherwise would require making assumptions about Alman's intentions that the record does not substantiate. Accordingly, we reverse the district court on this issue.

### 3.    City of Westland Disorderly Person Ordinance

Alman was charged with violating Westland's disorderly person ordinance after the state charges were dismissed. That ordinance makes it a misdemeanor for someone to be a "disorderly person," which the ordinance defines as, *inter alia*, "A person who is engaged in indecent or obscene conduct in a public place." Westland Mun. Ord. § 62-97(b)(6). The ordinance tracks the language of M.C.L. § 750.167(1)(f), which defines "disorderly person" identically. The district court summarily held that the Westland police officers had probable cause for this offense because "nothing on the face of this ordinance requires indecent exposure or the application of physical force, and Plaintiffs have come forward with no authority requiring such a showing for a violation of the ordinance." (R.57 at 30.)

Alman argues that there was no probable cause supporting this charge because the Michigan disorderly person statute "has been construed as proscribing public indecency, 'a concept generally associated with conduct consisting of exposing private

body parts when one reasonably might expect that they would be viewed unwantedly by others.'" (Appellants' Br. at 41) (quoting *United States v. Whitmore*, 314 F. Supp. 2d 690, 698 (E.D. Mich. 2004) (citing *In re Certified Question*, 359 N.W.2d 513, 518 (Mich. 1984).) The Westland defendants do not offer any serious argument in response, and in our view, Alman is correct. The statute is not clearly applicable on its face, and Michigan cases analyzing the statute indicate that the typical indecent person case involves unwanted exposure of private body parts. Drawing all reasonable inferences in Alman's favor, the record is devoid of any evidence that would lead a reasonable police officer to believe that Alman was engaged in, or was about to engage in, such conduct. We have uncovered no authority indicating that a brief touching of another person's crotch during a flirtatious conversation constitutes indecent or obscene conduct, and based on the record before us, it cannot be said that the Westland police officers had probable cause that Alman was about to expose himself. Accordingly, we reverse the district court on this issue.

### 4.     City of Westland Battery Ordinance

Alman also was charged with violating Westland's battery ordinance after his state charges were dismissed. That ordinance states: "No person shall with force or violence touch or put some substance in motion which touches another person or something closely connected with another person." Westland Mun. Ord. § 62-67. The district court held that there was no constitutional problem with charging Alman under this provision because there was probable cause for the disorderly person charge, and "probable cause to believe that a person has committed *any* crime will preclude an unlawful arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause." (R.57 at 31) (emphasis in original.) This was error.

As explained above, the Westland officers did not have probable cause to believe that Alman violated the state offenses or the Westland disorderly person ordinance, and so the officers must have independently had probable cause supporting this charge to avoid a constitutional violation. They did not. Michigan cases establish that the term

"force" requires that a person exert strength or power over another person. (Appellants' Br. at 43-44.) As explained above, the record does not support a reasonable belief that Alman used "force or violence" to accomplish the touching. Accordingly, there was no probable cause to believe that Alman had committed this offense, and we reverse the district court on this issue. Because we find that there was no probable cause supporting any of the charges brought against Alman, we reverse the district court's dismissal of Count I of the Amended Complaint.[3]

## B. Qualified Immunity

Sergeant Swope and Officer Thivierge argue that, even if Alman's arrest was not supported by probable cause, they are entitled to qualified immunity based on their reasonable mistakes.[4] The district court did not address any of the qualified immunity arguments below because its conclusion that probable cause existed effectively decided the case. Plaintiffs-Appellants have alleged constitutional violations only against Swope, and so we limit our qualified immunity inquiry to Swope.[5]

> Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Determining whether government officials are entitled to qualified immunity generally requires two inquiries: First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was

---

[3] We recognize that an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause," *Devenpeck*, 543 U.S. at 153, and that "'[k]nowledge of the precise crime committed is not necessary to a finding of probable cause provided that probable cause exists showing that a crime was committed,'" *United States v. Harness*, 453 F.3d 752, 755 (6th Cir. 2006) (quoting *United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991)). Indeed, a wrongful-arrest claim can fail if probable cause existed for a crime other than the crime for which the individual was arrested or charged. Here, however, the defendants argue only that probable cause existed as to the four crimes for which Alman was charged. They offer no other crime for which probable cause may have existed.

[4] The Wayne County Defendants did not raise a qualified immunity defense below or on appeal and therefore have waived any such argument. *See United States v. Reed*, 167 F.3d 984, 993 (6th Cir. 1999).

[5] Alman raised only a state law malicious prosecution claim against Thivierge, which is discussed in the next section.

the right clearly established at the time of the violation? These prongs need not be considered sequentially.

*Miller v. Sanilac Cnty.*, 606 F.3d 240, 247 (6th Cir. 2010) (internal quotation marks, citations, and footnotes omitted). Other Sixth Circuit cases have employed a third step, whereby the court "further considers whether a reasonable person would have known about the right and whether the official's actions were 'objectively unreasonable.'" However, more recent decisions apply the two-step test provided above." *Id.* at 247 n.4 (citations omitted).[6] In answering these questions, we must determine whether the right involved was clearly established "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

As explained above, Alman was arrested without probable cause, which is a violation of the Fourth Amendment, and it is "clearly established that [an] arrest without probable cause violates the Fourth Amendment." *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007). Swope argues that he is entitled to immunity because Alman has not established that Swope's belief that probable cause existed was unreasonable. (Westland Br. at 42-43.) In support, he points to the "conversation between Alman and Reed, as well as Alman's act of grabbing, fondling, touching, or brushing up against Reed's genitals, without Reed's consent." (*Id.* at 43.) In our view, Swope's actions were unreasonable, and he did not have probable cause. Swope testified that he could not hear the conversation between Reed and Alman and stated that he did not ask any follow-up questions before completing Alman's arrest after Reed told him that Alman had "grabbed me or touched my crotch." (R.42-5 at 2; R.40-5 at 20.) Without more facts at his disposal, he had no reasonable basis to believe that any of the offenses that Alman was charged with had occurred or were about to occur. Because Alman's clearly established Fourth Amendment rights were violated, qualified immunity does not shield Sgt. Swope in this case. *See Leonard*, 477 F.3d at 355 ("We will not grant immunity to

---

[6]As is the case with excessive force § 1983 cases, *see Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009), we might consider this third step to be subsumed within the first step because deciding whether a constitutional violation occurred based on a lack of probable cause necessarily involves deciding whether the arresting officers' actions were objectively reasonable under the circumstances.

a defendant if no reasonably competent peace officer would have found probable cause.")

## C. **Malicious Prosecution**

Alman brought a state law malicious prosecution claim, an intentional tort, against Thivierge for issuing the ticket invoking Westland's municipal ordinances. The district court dismissed this claim based on its finding that probable cause existed. Malicious prosecution claims are "difficult to maintain." *Matthews v. Blue Cross & Blue Shield of Michigan*, 572 N.W.2d 603, 609 (Mich. 1998). To make out a case of malicious prosecution under Michigan law, the "plaintiff has the burden of proving (1) that the defendant [had] initiated a criminal prosecution against him, (2) that the criminal proceedings terminated in his favor, (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice." *Id.* at 609-10. This issue was not thoroughly briefed on appeal, and the only argument made below was Thivierge's argument that probable cause existed for those offenses. Alman only addressed the argument in his reply brief, arguing that Thivierge acted with "malice and with deliberate indifference" when he wrote the local ordinance tickets without sufficient training and without having personal knowledge of the events in question. (Reply Br. 18-20.) Despite the lack of extensive briefing on this issue, we conclude that Alman has not established the elements of the tort and that his malicious prosecution claim was properly dismissed. Specifically, Alman has not pointed to any evidence establishing malice. (A lack of probable cause itself cannot constitute malice, as that would render the third and fourth elements of the tort duplicative.) Accordingly, we affirm the dismissal of this claim (Count VIII), albeit on different grounds than the district court identified.

## D. **Municipal Liability Under § 1983 for Failure to Train**

Alman raised § 1983 claims against Sgt. Swope, Wayne County, and the City of Westland based on their alleged failure to train police officers on how to enforce the

laws related to sexual activity (Counts II, III, and IV). The Supreme Court has approved municipal liability based on § 1983 when "the [municipal] action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where such actions emanate from informal governmental custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). In other words, the constitutional violation must have sprung from "official policy" in one form or another. *Id.* at 694. As such, local government units cannot be held liable mechanically for their employees' actions under a *respondeat superior* theory. *Id.* at 691. The plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bryan Cnty. Bd. of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). He "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* Applying that principle, the Supreme Court has held that a municipality can be liable under § 1983 on a failure-to-train theory when the "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). This happens in the unusual case where "such inadequate training can justifiably be said to represent 'city policy.'" *Id*. at 390. We have characterized this standard as requiring the plaintiff to prove "three distinct facts": "that a training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (citing *City of Canton*, 489 U.S. at 90-91).

The district court, having concluded that probable cause existed for Alman's arrest and that there was no constitutional violation, did not address this issue. Alman argues that "Westland not only failed to train Reed, [but] his supervisor Sgt. Swope participated in that wrongful conduct, resulting in supervisory liability" because "Swope himself was not properly trained about the elements of the offenses" involved. (Reply Br. at 22.) Specifically, Alman argues that Swope never received specific training about the sexual activity laws or what "accosting" meant, which created a likelihood that

constitutional violations would occur and recur. (Reply Br. at 22-23.) But that in itself does not constitute deliberate indifference, as there is no allegation that Westland (or Wayne County) officials had any specific awareness of the potential for violations. This allegation is too generalized to support municipal liability. *See City of Canton*, 489 U.S. at 391 (rejecting liability when an "otherwise sound program has occasionally been negligently administered," and explaining that "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.") Accordingly, we affirm the dismissal of Counts II, III, and IV.

## E.  Barnes's Fourth Amendment Claim

Plaintiff-Appellant Barnes raised a § 1983 claim based on the seizure of his car, which Alman drove to Hix Park on the day he was arrested (Count IX[7]). The seizure of a vehicle in connection with an arrest not supported by probable cause violates the Fourth Amendment in the same manner that the arrest itself violates the Fourth Amendment. "In the ordinary case, the [Supreme] Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983). There are, of course, exceptions to that rule, which permit police seizures of property when the exigencies of the situation demand it, *see id.* at 701-02, such as during a search incident to arrest, *see Arizona v. Gant*, 556 U.S. 332, 338-39 (discussing that and other exceptions). But those exceptions do not disturb the rule that if an arrest

---

[7]Barnes also raised a conspiracy claim against Wayne County and Westland, but he has not addressed the dismissal of that claim on appeal, so we do not disturb the district court's dismissal of that claim (Count X).

violates the Fourth Amendment, the subsequent seizure of property based on the invalid arrest violates it as well.

In *Ross v. Duggan*, this Court addressed a situation similar to the one in this case. 402 F.3d 575 (6th Cir. 2004). There, several plaintiffs challenged the City of Detroit's seizure of their vehicles during their arrests for prostitution-related offenses. *Id.* at 578. The City justified its seizure based on Michigan's nuisance abatement statute, and we held that the statute permitted the seizure of vehicles used to transport someone to the scene of the crime. *See id.* at 580, 582-83. But *Ross* does not decide the case before us because *Ross* involved plaintiffs who had effectively *conceded* that probable cause existed for their offenses. *See id.* at 584-87 (holding that the existence of probable cause "furnished constitutional justification for the temporary pre-forefeiture-hearing impoundments of the subject vehicles").

Of course, *Ross* also held that there was nothing constitutionally deficient about Michigan's nuisance abatement statutes, *id.* at 582-83, and so Barnes's argument to the contrary, and his argument that *Ross* was wrongly decided, (Appellants' Br., at 50-53), are meritless. Similarly, *Ross* forecloses Barnes's argument that the Michigan nuisance statute does not permit the type of impoundment that took place here, since Alman traveled to the scene of his alleged crime in Barnes's car. *See id.* But although the statute and the Constitution may allow the state to seize a vehicle during an arrest for sexual conduct offenses, neither authorizes such a seizure without probable cause.[8]

The district court dismissed this claim based on its finding that probable cause existed for Alman's arrest. (R.57 at 35.) As explained above, this was error because

---

[8]The parties argue about whether Barnes has waived his right to seek relief for any constitutional violation based on his payment of a $900 settlement fee. We conclude that Barnes has not waived any such right. The acknowledgment letter that Barnes signed upon paying the fee states: "The Wayne County Prosecutor's Office has explained to the understanding [sic] owner(s) his/her/their right to contest the abatement of the vehicle pursuant to MCL 600.3801 et seq. and the undersigned agrees to wave [sic] the right to contest. . . . This precludes any action in this case regarding the vehicle and constitutes a final settlement of the civil nuisance abatement case. This settlement is independent and has no effect on any criminal charges that may arise from the same incident." (R.40-8 at 4.) In our view, this waiver refers only to the right to contest the abatement under the Michigan statute, and does not implicate constitutional rights. It is not sufficiently specific to constitute a waiver of constitutional rights, and such waivers "are not to be presumed lightly." *Barden Detroit Casino, LLC v. City of Detroit*, 230 F.3d 848, 855 (6th Cir. 2000). We make no such presumption here.

Alman's arrest was not supported by probable cause.  Accordingly, we reverse the district court's dismissal of Count IX.

## F.  Barnes's Abuse of Process Claim

Barnes raised a state law claim for abuse of process (Count XI) based on the seizure of his vehicle and the requirement that he pay a $900 fee before the car was released.  To establish abuse of process under Michigan law, a plaintiff "must plead and prove (1) an ulterior purpose, and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman v. Dozorc*, 312 N.W.2d 585, 594 (Mich. 1981).  In other words, the plaintiff must show that the defendant used a proper legal procedure for a purpose collateral to its intended use, and there must be some corroborating act that demonstrates the ulterior purpose. *Bonner v. Chicago Title Ins. Co.*, 487 N.W.2d 807, 812 (Mich. Ct. App. 1992).  In an earlier case, a Michigan court explained:

> The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

*Three Lakes Ass'n v. Whiting*, 255 N.W.2d 686, 690 (Mich. Ct. App. 1977).

The district court dismissed this claim based primarily on its finding that probable cause supported Alman's arrest.  (R.57 at 37-38.)  Alman argues that the Wayne County Prosecutor's Office "used the nuisance abatement process to extort the payment of money" from Barnes "for its own enrichment," (Appellants' Br. at 55-56), which constitutes an ulterior purpose and therefore an abuse of process.  Alman does not cite any authority for this proposition, and he has not pointed to any evidence in the record that demonstrates that Wayne County is engaged in a "form of extortion" through the nuisance abatement law.  All he offers is the fact that impounded vehicles are not released without a settlement fee being paid by the owner, and that the fee is shared

among the various governmental entities. That is insufficient to establish an abuse of process claim, and we affirm the district court's dismissal of this claim (Count XI).

## IV.  CONCLUSION

The judgment of the district court is REVERSED in part and AFFIRMED in part, and the case is REMANDED for further proceedings consistent with this opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

BOGGS, Circuit Judge, concurring in part and dissenting in part. This is a difficult and convoluted case, and the court's opinion generally makes an excellent exegesis of the different statutes and principles involved here. In brief, on the general outline of the facts as presented here, we have a fairly garden-variety police sting operation aimed at public-morals offenses, a tactic that many may find distasteful. In this case, as appropriately discussed at pages 4–5 of the court's opinion, the plaintiff Alman did, without consent or invitation, touch the officer's crotch. However, the exact nature and contours of that touching are disputed, as is the import of the plaintiff's immediately subsequent kneeling.

The court's discussion, which is appropriate and necessary under these circumstances, of the Michigan law on "force" or "surprise" makes a valiant effort, at pages 11–13 to hold that there was no probable cause for an arrest *in these circumstances*, while not vitiating the applicability of the Michigan CSC4 statute to other cases of what might generally be called "groping."

In the end, I find this effort successful, with two caveats. First, as the court's opinion repeatedly emphasizes, we are taking all facts and inferences in the plaintiff's favor, and on further development, either a fact-finder or a fact-based motion for summary judgment may dispose of this suit in favor of defendants. Second, the opinion correctly emphasizes on page 14 that the error here was holding that probable cause "existed as a matter of law," based only on the admitted fact some degree of genital touching.

However, under these circumstances, I disagree with the court's opinion as to qualified immunity for Sargent Swope. His involvement was only to authorize an arrest, based on the facts as reported to him by Officer Reed. Given the intricacy of the court's analysis (albeit ultimately correct), I cannot agree that we must label Officer Swope as

outside the ambit of "reasonably competent police officer" because he made the judgment on the spot, under the circumstances, that there was probable cause.

With that exception, I concur in the judgment of the court.